IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DOMINGO JOSE PALAFOX, | Cause No. CV 23-82-M-DLC |
| Petitioner, | |
| vs. | ORDER |
| WARDEN GREEN, ATTORNEY GENERAL OF MONTANA, | |
| Respondents. | |

Pending before the Court is pro se petitioner Domingo Jose Palafox's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. (Doc. 1). As previously noted, this Court is required to screen all actions brought by prisoners who seek relief. 28 U.S.C. § 1915(a). The Court must dismiss a habeas petition or portion thereof if the prisoner raises claims that are legally frivolous or fails to state a basis upon which relief may be granted. 28 U.S.C. § 1915A(b)(1), (2).

As explained herein, Palafox's petition will be dismissed. His sufficiency of the evidence claims to not survive deferential review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and his remaining claim is not cognizable in federal habeas.

1

## I.     Background

The Montana Supreme Court has summarized the factual background of

Palafox's state court proceedings as follows:

> In spring of 2020, Palafox showed a video to Gideon Davis (Gideon), his long-time friend. The video depicted Palafox tying his dog to a tree and lighting it on fire.
>
> Gideon told Palafox he had gone too far, angering Palafox. At some point, Palafox and Gideon discussed the video again. Gideon told Palafox that people knew Palafox had done it and that a lynch mob would likely show up at his door if he was not careful.
>
> A few weeks after Palafox showed Gideon the video, Palafox told Gideon that if anyone spoke up about the video, he would put a $10,000 hit on their head. At the time, Gideon was still contemplating whether he should speak up about the video, and Palafox's threat concerned him. Gideon understood the threat to mean anyone who snitched "was dead" and knew that Palafox had the ability to carry out the threat. Gideon stopped socializing with Palafox after this interaction. On June 11, 2020, Palafox and his girlfriend Winter Haugen (Haugen) drove to Gideon's family home. When Palafox pulled up to the house, he began honking and yelling at Jeremiah Davis (Jeremiah), Gideon's brother. This incident and an incident occurring shortly thereafter at the local Town Pump serve as the basis for the State's charges of witness tampering.
>
> Palafox was eventually charged with two counts of tampering with witnesses, felonies, in violation of § 45-7-206, MCA, and aggravated animal cruelty, a felony, in violation of § 45-8-217, MCA. Palafox pleaded guilty to aggravated animal cruelty. On December 23, 2020, a nonjury trial was held on the witness tampering counts. At the close of the State's case, Palafox moved to dismiss both counts for insufficient evidence, which the District Court denied. The District Court found Palafox guilty of each count of witness tampering and imposed a sentence of ten years on one count and a consecutive ten-year sentence on the second count. Only the sentence for the second witness tampering count was suspended. The District Court also imposed two years on the count charging aggravated animal cruelty. The

sentences on all counts were run consecutively. Palafox appeals only his convictions for witness tampering.

During the bench trial, Jeremiah testified that on June 11, 2020, Palafox and Haugen drove to Gideon's house and Palafox began yelling he was going to have Gideon taken care of, that he was a snitch, and that he would see him in court. Gideon testified that Palafox yelled at him that he and his family "were done for" and that "I was a narc, I was going to get killed. He was putting a hit out on me and my family is not safe anymore." Gideon testified that Palafox was not only threatening him directly, but also Jeremiah since Jeremiah is "a member of my family," and he did not "see how [Jeremiah is] not being threatened if he says your family is done."

Palafox called one witness at trial, his partner Haugen. Haugen testified that she was in the car with Palafox and witnessed the encounters between Palafox, Gideon, and Jeremiah. She testified that first Jeremiah came out of the house and Palafox told him "tell your brother I know he's a narc and I'll see him in court," and then when Gideon walked outside, Palafox told him "I know you are a narc I'll see you in court." According to Haugen, Palafox did not say anything else to Gideon or Jeremiah. Haugen testified that before this incident, Palafox tried to contact his lawyer "to see what he could do about slander charges" against Gideon and so "see him in court" referred to a legal matter. However, Jeremiah testified that Palafox never mentioned a lawsuit, slander, or lawyers.

A few minutes after this incident at the house, another incident occurred between Palafox and Jeremiah at the local Town Pump. Jeremiah testified that while at the Town Pump for gas, Palafox drove up and began threatening Gideon, "[s]aying he was going to have him taken care of, and I'll see you in court and a bunch of other stuff." Jeremiah confronted Palafox and followed him into the Town Pump as Palafox was "running his mouth." Inside, Palafox "was talking and yelling and he was spitting in [Jeremiah's] face," so Jeremiah pushed him away. Jeremiah was charged with assault, but ultimately pleaded guilty to disturbing the peace. Jeremiah testified that he interpreted Palafox's threats to mean Palafox would "have us dealt with, send someone out to beat us up or something like that," rather than take his family to court.

Conversely, Haugen testified that she observed the entire Town Pump incident while sitting in their vehicle parked on the side of the road.

According to her, after they parked, Palafox did not speak to anyone. She testified that there was no interaction between Palafox and Jeremiah outside the Town Pump. Instead, Palafox first walked into the store alone. After he entered, Jeremiah ran inside after him. Haugen testified that as far as she saw, Palafox did not taunt or threaten Jeremiah in any way, nor did he interact with Jeremiah until after Jeremiah ran inside. On cross-examination, Haugen was questioned about her observations and a surveillance video, which was not entered into evidence, as follows:

> Q: [Prosecutor]: Is it your testimony that [Palafox] did not threaten Jeremiah or his brother in any way?
> A: [Haugen]: No, he didn't.
> Q: [A]re you aware that there is video surveillance of that parking lot?
> A: Yes, I am. Yes.
> Q: And if the video that was reviewed that day relating to this incident indicated that [Palafox] was, in fact, interacting with Jeremiah ... is it still your testimony that that didn't happen?
> A: I didn't see it. So ...
> Q: Okay. So you're not testifying it didn't happen, you are just testifying you didn't see it?
> A: Yes.

Haugen also testified that she knew Palafox was angry when they drove to the house that day. She said he was upset because he had discovered Gideon was "saying stuff" about how Palafox had hurt one of their dogs. When asked on cross-examination how Palafox knew Gideon was saying things, Haugen responded she told Palafox about it after she found out on Facebook. Additionally, Haugen testified that she knew Palafox had been accused of lighting the dog on fire but that she did not believe it was their dog. Text messages on Haugen's seized cellphone, however, demonstrated that she knew the dog was hers.

Although Gideon did not make a report of the video until after the Town Pump incident, he had contacted an individual on the Troy Montana website to try to get the contact information of the City's Chief of Police, Katie Davis. Gideon testified that later, Chief Davis contacted him after discovering he was trying to reach her and he discussed the video with her.

Chief Davis investigated the animal cruelty incident and reviewed the surveillance video of the Town Pump incident. Chief Davis testified that the

4

video showed Palafox walking towards the Town Pump store and turning and talking towards the fuel pumps where Jeremiah was. Chief Davis stated that Jeremiah "went from pumping fuel to being instantly upset and going in afterwards." Further, the following exchange took place regarding Haugen's testimony about the incident:

> Prosecutor: And was your review of the video consistent with Ms. Haugen's testimony a few minutes ago about what took place in the parking lot?
> Chief Davis: She would not have been able to see it from her vantage point.

Chief Davis testified that she first received a report about a distressed dog on March 9, 2020. Chief Davis found the dog curled up under a pine tree in very bad shape and very weak. The dog had multiple injuries. Chief Davis took a photo of the dog and sent it to the city Facebook page to find the dog's owner. The dog was eventually fostered by the Pet Connection Sanctuary. Chief Davis also testified that there was a lot of publicity about the incident and that she received tips that Palafox was the dog's owner. Around the end of March or beginning of April, Chief Davis followed up on the tips and attempted to contact Gideon. Gideon's father answered the phone and told Chief Davis that she would not be speaking with Gideon because Gideon had been told to watch his back, which Chief Davis interpreted to mean that Gideon was afraid to speak with her.

In mid-May, a few weeks before the June 11 incident between Palafox, Jeremiah, and Gideon, Chief Davis contacted Palafox to inform him there was a pending investigation into what happened to the dog. She testified it was her perception that Palafox believed Gideon had already spoken to law enforcement when he went to the house on June 11. On June 15, Chief Davis spoke with Gideon and Jeremiah. For the first time, Gideon told Chief Davis about Palafox's video depicting animal cruelty. Gideon and Jeremiah expressed fear of Palafox and stated they anticipated extreme violence.

*State v. Palafox*, 2023 MT 26, ¶¶ 3-14, 411 Mont. 233, 524 P. 3d 461.

On appeal, Palafox argued the State failed to present sufficient evidence to support his convictions for witness tampering; that he was denied a fair trial due to

prosecutorial misconduct; and that trial counsel's failure to object to the prosecutorial misconduct amounted to ineffective assistance of counsel. *Palafox*, 2023 MT 26, ¶¶ 2, 15. The Montana Supreme Court affirmed Palafox's convictions finding that there was sufficient evidence to support the Witness Tampering convictions, that the challenged prosecutorial misconduct did not rise to the level required to invoke plain error review, and that Palafox's non-record-based IAC claim was inappropriate for direct review. *Id*. at ¶ 33.  Palafox did not seek any other form of collateral review in the state courts, including filing a petition for postconviction relief of a petition for state habeas corpus relief.  (*See* Doc. 1 at 3.)

In his petition before this Court, Palafox claims: (1) his Fourteenth Amendment rights were violated when the Montana Supreme Court affirmed the state district court because the findings made during the bench trial were insufficient to prove every element of the offenses of Witness Tampering, (*Id*. at 4, 8-10); (2) his Fourteenth Amendment rights under *In re Winship,* 397 U.S. 358 (1970), were violated because the State did not prove every element beyond a reasonable doubt and wrongfully concluded that one of the witnesses was not required to have knowledge about the underlying animal cruelty incident, (*id*. at 4-5, 10-13), and (3) the Montana Supreme Court erred in affirming his convictions because his conduct, at most, constituted witness retaliation and not witness tampering.  (*Id*. at 6, 13-16.)

## II.   Analysis

Palafox's claims were addressed by the Montana Supreme Court on direct appeal and were denied for lack of merit. Therefore, this Court's consideration of the claims is constrained by the applicable standard of review.  The AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court subject only to the exceptions listed in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 89 (2011).  Accordingly, this Court cannot grant habeas relief under AEDPA unless the state court's analysis "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or it "was based on an unreasonable determination of the facts," *id*. § 2254(d)(2).  "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demand that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal citation and quotations omitted).

### A. Claims 1 & 2- Sufficiency of the Evidence

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  *Jackson v. Virginia*, 443 U.S. 307 (1979), provides the federal standard for determining the sufficiency of the evidence to support a jury finding.  Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis in original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2010)(per curiam)("the only question under *Jackson* is whether that finding was so insupportable so as to fall below the threshold of bare rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (20110(per curiam)(habeas court may set aside the verdict on the ground of insufficient evidence "only if no rational trier of fact could have agreed with the jury").

 When reviewing the record, this Court "must consider all of the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010)(per curiam). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F. 3d 1355, 1358 (9th Cir. 1995). This Court must respect the province of the fact finder to "ascertain the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inference from proven facts" by assuming all matters were resolved in a manner which supports the verdict. *United States v. Kilby*, 443 F. 3d 1135, 1140 (9th Cir. 2006)(citation omitted).  This Court does not decide whether it would have found the trial evidence sufficient or scrutinize "the reasoning process actually used by the factfinder." *Jackson*, 443 U.S. at 318-19, n. 3.  When the factual record supports conflicting inferences, the federal court must presume- even if it does not appear

affirmatively on the record- that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326.

When a case is governed by Section 2254(d), the federal habeas court must "apply the standards of *Jackson* with an additional layer of deference." *Juan H. Allen*, 408 F. 3d 1262, 1274 (9th Cir. 2005); *see also Johnson*, 556 U.S. at 651 ("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."). "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos*, 565 U.S. at 2 (citation omitted); *see also Boyer v. Belleque*, 659 F. 3d 957, 965 (9th Cir. 2011)("Stated another way, to grant relief, [a federal court] must conclude that the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable.").

Under *Jackson*, "federal courts must look to state law for 'the substantive elements of the criminal offense,' …, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Johnson*, 566 U.S. at 655. Additionally, "a state court's interpretation of state law, including on announced on direct appeal of the challenged conviction, binds a

federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)(per curiam).

Under Montana law, a person tampers with witnesses if, believing that an official proceeding or investigation is pending or about to be instituted, the person purposely or knowingly attempts to induce or otherwise cause a witness or informant to:

(a) testify or inform falsely;
(b) withhold any testimony information, document or thing;
(c) elude legal process summoning the witness or informant to testify or supply evidence; or
(d) not appear at any proceeding or investigation to which the witness or informant has been summoned.

Mont. Code Ann. § 45-7-206. A review of the record shows that the state courts reasonably denied Palafox's sufficiency of the evidence claims relating to witness tampering.

### i. The Montana Supreme Court Decision

On appeal Palafox argued that the State presented insufficient evidence that on June 11, 2020, he believed Gideon would act as an informant in the animal cruelty investigation. In support of this contention, Palafox pointed out that Gideon did not speak with law enforcement until after the June 11th incident, where threats were made to Gideon and Jeremiah. *Palafox*, 2023 MT 26, ¶ 21. The Court pointed out that Palafox knew that he had shown the video depicting animal cruelty to Gideon months prior. Also, Chief Davis had informed Palafox in May of the

ongoing investigation. Palafox's partner, Haugen, testified that she knew prior to June 11 that Palafox had been accused of lighting their dog on fire. Haugen further testified that Palafox initiated the June 11th events after she informed him that Gideon had been "saying stuff" on Facebook about him hurting the dog and Palafox became upset. The Court reasoned that whether or not Palafox believed Gideon had already reported the video to law enforcement, the testimony demonstrated that he knew an animal cruelty investigation was ongoing and believed Gideon to be speaking out about it. *Id*.

Palafox argued that he confronted Gideon on June 11th because Gideon was slandering him online. Palafox maintained that telling Gideon he would "see him in court," referenced his intent to sue Gideon for slander. Jeremiah testified that Palafox threatened to see Gideon in court and additionally threatened that "he was going to have [Gideon] taken care of." *Id*. at ¶ 22. Additionally, Gideon testified that Palafox threatened him, and that his family "were done for"; that "[Gideon] was a narc, [who] was going to get killed"; and that "[Palafox] was putting a hit out on [Gideon] and [his] family is not safe anymore." The Court determined these threats clearly went beyond intending to sue Gideon for slander. *Id*.

In arriving at its verdict, the district court stated that even if all Palafox said was "I know you are [a] narc I will see you in court," all the elements of witness tampering would be met as to Gideon, because threatening to sue another for

11

something that one later admits to doing is an attempt to get the other to withhold testimony or testify falsely. *Id*. at ¶ 23. But the Montana Supreme Court noted "I'll see you in court" was not Palafox's only threat to Gideon; there was ample evidence presented that Palafox's threats exceeded a civil lawsuit. Gideon and Jeremiah both testified that Palafox threatened to harm Gideon and his family or have them killed. *Id*. Prior to the June 11th incident, Palafox threated to have anyone who spoke out about the video killed. Accordingly, when viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to support the witness tampering conviction as it pertained to Gideon. *Id*.

 Relative to the witness tampering count involving Jeremiah, Palafox contended the district court rejected the possibility that Palafox believed Jeremiah would serve as a witness in the animal cruelty investigation when it determined Jeremiah never actually viewed the video depicting the animal cruelty. *Id*. at ¶ 24. The Court observed, however, that witness tampering merely requires a defendant to believe an "official investigation is pending or about to be instituted…" § 45-7-206, MCA. Thus, at the time of each alleged count of tampering, Palafox knew he was being investigated for animal cruelty; it was not necessary for Jeremiah to have actually seen the video. *Id*. The Court also noted testimony showed Palafox's statements to Jeremiah at the Town Pump were made with an intent to thwart Jeremiah's participation in the official investigation. Jeremiah witnessed

Palafox threaten Gideon and tell him that he and his family was done for, and that Palafox would put a hit out on Jeremiah. Jeremiah's testimony indicated that Palafox threatened his brother, and he believed Palafox would have the family, including Jeremiah, "dealt with" which included "send[ing] someone out to beat us up or something like that." *Id*.

Haugen conceded that she could not see the interaction between Palafox and Jeremiah at Town Pump. *Id*. at ¶ 25. The district court also found Jeremiah to be a credible witness. In light of all of the evidence, the Court concluded there was sufficient evidence to support Palafox's tampering conviction involving Jeremiah. *Id*.

### ii.    Section 2254(d) Deference

Palafox first suggests that the Montana Supreme Court erred in its decision affirming the convictions because it reviewed the entire trial record, not just the district court's actual findings and used facts not found by the district court to affirm the tampering convictions. (Doc. 4 at 1-2.) In support of his contention, Palafox cites *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F. 3d 603, 613 (9th Cir. 2020), for the proposition that "an appellate court is prohibited from making factual findings in bench trial beyond those made by the district court." (Doc. 4 at 2.) But in *Oakland Bulk*, the Circuit observed that it must give factual findings made after trial "substantial deference" and can reverse "only if the

district court's findings are clearly erroneous to the point of being illogical, implausible, or without support in inferences from the record." *Id*. at 960 F. 3d at 613 (citations omitted). Moreover, the appellate court reviewed "the trial record in its entirety" and determined that the lower court's findings were not clearly erroneous. *Id*. Thus, the case cited does not stand for the proposition which Palafox advances. This Court finds the Montana Supreme Court properly reviewed the entire trial transcript in arriving at its decision finding sufficient evidence supported the two witness tampering convictions.

Palafox believes that the deferential standard of § 2254(d) should not apply because his Fourteenth Amendment rights were violated, and the Montana Supreme Court's decision violated *In re Winship*. Accordingly, Palafox asserts this Court should review his claims de novo and grant him habeas relief. (Doc. 4 at 2-4.) The Court disagrees.

As set forth above, the Montana Supreme Court explained in detail its rationale for affirming Palafox's tampering convictions and the trial testimony and evidence that supported its decision. The Montana Supreme Court pointed to specific testimony from the record. The testimony of a single witness, if believed, is sufficient to support a conviction. *See United States v. Larios*, 640 F. 2d 938, 940 (9th Cir. 1981). Moreover, any discrepancies or issues with respect to the believability of witness testimony were factors for the trier of fact to consider. *See*

*Jones v. Wood*, 207 F. 3d 557, 564 (9th Cir. 2000). Notably, the district court found Jeremiah and Gideon to be more credible witness than Palafox or Haugen.

This Court is required to view the evidence presented at trial in the light most favorable to the prosecution. In so doing, the Court finds a rational trier of fact could have found the elements of witness tampering, as related to both Gideon and Jeremiah, existed based upon the evidence. A rational and reasonable trier of fact could have found that there was sufficient evidence of guilt as to both counts; each element was proven beyond a reasonable doubt. Accordingly, the Montana Supreme Court's decision was objectively reasonable. *See e.g., Cavazos*, 565 U.S. at 2

Under *Jackson*, this Court is not permitted to find that the trier of fact should have concluded that witness tampering did not take place. *Jackson*, 443 U.S. at 319. Even if different conclusions could possibly be drawn from the evidence presented at trial, there was sufficient evidence to support a finding of guilt on both counts of witness tampering. Under the applicable standards, that is all due process requires. Thus, the Montana Supreme Court's rejection of the two sufficiency of the evidence claims pertaining to witness tampering, is not contrary to or an unreasonable application of the doubly deferential review required by *Jackson*. *See Juan H. Allen*, 408 F. 3d at 1274. Under Section 2254(d)(1), this

Court must afford deference to the state court decision. Palafox is not entitled to habeas relief on these claims.

### B. Claim 3

In his final claim, Palafox argues that the Montana Supreme Court erred in affirming his convictions because his conduct, at most, constituted witness retaliation and not witness tampering. (Doc. 1 at 6, 13-16.) As explained in detail above, the Montana Supreme Court reasonably found that Palafox violated state law by witness tampering as it related to both Gideon and Jeremiah. "[A] state court's interpretation of state law, including on announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76. Accordingly, Palafox's claim is not cognizable in federal habeas. *See Hendricks v. Zenon,* 993 F. 2d 664, 674 (9th Cir. 1993) (claim exclusively concerned with state law not cognizable in federal habeas); *Mendez v. Small*, 298 F. 3d 1154, 1158 (9th Cir. 2002)("[a] state court has the last word on interpretation of state law"); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Bonin v. Calderon*, 59 F. 3d 815, 841 (9th Cir. 1995) (violation of a "state law right does not warrant habeas corpus relief"); *Lewis v. Jeffers*, 497 U.S. 764, 789 (1990) ("Federal habeas corpus relief does not lie for errors of state law"); *Peltier v. Wright*, 15 F. 3d 860, 861-2 (9th Cir. 1994)

(generally federal habeas corpus relief unavailable for errors of state law). This claim will also be denied.

### III. Certificate of Appealability

A prisoner seeking relief under § 2254 may appeal a district court's dismissal of the petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A COA may be issued only where a petitioner has made "a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(3). A prisoner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issue presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

The Court finds that Palafox has not made a substantial showing of the denial of a constitutional right. Therefore, a certificate of appealability will not issue in this action. *See* 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b); *Miller-El*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Based on the foregoing, the Court enters the following:

**ORDER**

1. Palafox's Petition (Doc. 1) is DENIED and DISMISSED.

2. The Clerk of Court is directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability is DENIED.

DATED this 28th day of February, 2024.

>   */s/ Dana L. Christensen*
>   Dana L. Christensen
>   United States District Court Judge